UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VERITAS-SCALABLE INVESTMENT     :
PRODUCTS FUND, LLC              :
                                :
v.                              :     No. 3:04cv01199 (JBA)
                                :
FB FOODS INC.                   :

### Ruling on Defendant's Motion to Dismiss [Doc. # 34]

Plaintiff Veritas-Scalable Investment Products Fund, LLC (Veritas) filed this suit against defendant FB Foods Inc. (FBF) to recover on two unpaid promissory notes, each in the amount of five hundred thousand dollars.  Defendant FBF has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) alleging lack of personal jurisdiction. See [Doc. # 34].  For the reasons set forth below, the defendant's motion to dismiss is denied.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts were adduced from the discovery the Court permitted concerning personal jurisdiction.  See Scheduling Order [Doc. # 30].  Defendant FBF is a Florida corporation, primarily engaged in the manufacture and sale of Funny Bagels. Funny Bagels are a line of refrigerated children's lunch kits. Plaintiff is a venture capital firm organized under the laws of Delaware, with its place of business located in Connecticut.

In 2003, FBF was seeking approximately $10,000,000-$30,000,000 in outside investments.  To this end, the defendant entered into an agreement with McMahan Securities Co. L.P. (MSC)

1

whereby MSC agreed to locate and facilitate financing for FBF in exchange for a finder's fee.  Finder's Agreement [Doc. # 52, Ex. A].  MSC is a Connecticut company with offices in Greenwich.  FBF worked with Michael Shillan, MSC's Managing Director of Investment Banking to finalize the agency agreement.  Id.  Though MSC's office is located in Connecticut, it appears that FBF conducted its negotiations with Shillan in Florida.[1]  See Appel Aff. ¶ 2 [Doc. # 52].  The finder's agreement was signed by both Shillan and William Salgado, FBF's Executive Vice President, on November 7, 2003.  See Finder's Agreement [Doc. # 52, Ex. A].

Pursuant to that agreement, MSC arranged for the plaintiff, Veritas, to lend FBF one million dollars.  FBF set up subscription agreements whereby subscribers purchased one hundred thousand dollar units from it.  Veritas signed two subscription agreements for five units each.  In arranging the subscription agreements, MSC communicated with Veritas on the FBF's behalf. MSC and Veritas, both located at the same address,[2] conducted their negotiations with each other in Connecticut.  See Stone

---

[1] FBF claims not only that the negotiations were conducted in Florida, but also that they took place at MSC's Florida offices. Salgado Aff. ¶ 9 [Doc. # 34, Ex. A].  MSC acknowledges that Shillan conducted at least some business with FBF in Florida, but denies that it has ever maintained a Florida office.  Appel Aff. ¶ 2 [Doc. # 52].

[2] Both Veritas' and MSC's offices are located at 500 West Putnam Ave. in Greenwich.  Amd. Compl. ¶ 1 [Doc. # 33] (listing plaintiff's address); Finder's Agreement [Doc. # 52, Ex. A] (listing MSC's address).

Aff. ¶¶ 1-2 [Doc # 52].  Additionally, Veritas' attorney, Andrew Stone,[3] took part in numerous phone calls from Connecticut with FBF's Florida counsel concerning the subscription agreements, and also reviewed the subscription agreements, in Connecticut.

The subscription agreements were signed by Veritas in Connecticut and the acknowledgment page of the first subscription agreement was signed by FBF, presumably in Florida.  <u>See</u> Subscription Agreements [Doc. # 52, Exs. B & C]; <u>see also</u> Stone Aff. ¶ 9 [Doc. # 52] (indicating that Veritas signed the subscription agreements in Connecticut).  The acknowledgment page of the second subscription agreement remains unsigned.  <u>See</u> Second Subscription Agreement [Doc. # 52, Ex. C].

According to each of the subscription agreements, Veritas was to deliver $500,000 to FBF and FBF would then issue a promissory note to Veritas in that amount.  To perform its obligations under the subscription agreement, Veritas wired one million dollars to the defendant from its Greenwich, Connecticut Wachovia Bank account on November 28, 2003.  Wire Transfer [Doc. # 52, Ex. E].  FBF subsequently performed its obligations under the subscription agreements by issuing two promissory notes, each in the amount of $500,000, and each calling for repayment, with

---

[3] Stone is also listed as MSC's contact in the agreement between FBF and MSC and as an agent of MSC on the signature page of the subscription agreements.  Finder's Agreement and Subscription Agreements [Doc. # 52, Exs. A, B & C].

interest, by June 1, 2004.  Both executed promissory notes were sent to Veritas in Connecticut.  Ziegler Aff. ¶ 6 [Doc. # 52].

The parties disagree over where payment on the notes was to be made.  The notes themselves state that payment "shall be made by check and sent to Holder's address set forth above or to such other address as the Holder may designate from time to time by written notice to the Company."  Promissory Notes [Doc. # 33, Exs. A & B].  While the promissory notes list no address for Veritas, the two subscription agreements, to which unsigned copies of the promissory notes were attached, list Veritas' address on their signature pages as "Andrew Stone, Esq. McMahan Securities Co., L.P.[,] 500 West Putnam Avenue[,] Greenwich, CT 06830".[4]  Id.  FBF states that it "agreed to make all payments due on the Promissory Notes through Shillan in McMahan's Florida home office."  Salgado Aff. ¶ 9 [Doc. # 34, Ex. A].

The defendant allegedly never made payment anywhere to the plaintiff on either note, and on July 19, 2004, Veritas sent two letters, one for each note, to FBF informing it that payment was due immediately and was to be sent to Veritas' Greenwich, Connecticut address listed on its letterhead.  Payment Demand

---

[4] It appears that the original intention of the parties was to attach signed copies of the promissory notes to the subscription agreements, but the promissory notes, which were signed after the subscription agreements, were never physically attached.  See Promissory Notes [Doc. # 33, Exs. A & B]; Subscription Agreements [Doc. # 52, Exs. B & C].

Letters [Doc. # 52, Ex. J].

In addition to these contacts with Veritas in Connecticut, plaintiff shows that members of FBF and MSC personally met in Greenwich, Connecticut with an officer from Amaranth Advisors, L.L.C. to discuss Amaranth's interest in investing in FBF and FBF's business prospects.  Appel Aff. ¶ 6.

Veritas also has presented evidence that FBF actively solicits business in Connecticut.  The line of Funny Bagels sold in Connecticut stores make up as much as 1% of FBF's revenue. Salgado Aff. ¶ 7 [Doc. # 34, Ex. A].  On May 19, 2002, nearly two million full page "drops," or advertisements, for Funny Bagels appeared in New England newspapers.  See [Doc. # 52, Ex. N].  In a January 9, 2004 email, Dave Smith, FBF's Chief Operating Officer, described Hartford as a "focus market" and noted the company's expanding market share there.  [Doc. # 52, Ex. L].  FBF also arranged for in-store demonstrations of Funny Bagels in Connecticut stores, including Shaw's and Wal-Mart stores, between 2001 and 2003.  See Shaw's Demo Invoice [Doc. # 52, Ex. O]; James Depo. at 21-22, 25, 28 [Doc. # 52, Ex. P].  At the behest of FBF, an agent of Try-Angle Foods, Inc. staffed an FBF booth at the Hartford, Connecticut Big Y Food Festival at 2002.  Lorenzetti Aff. ¶ 3 [Doc. # 52, Ex. S].  FBF also distributes its products through at least one Cheshire, CT based distributor, see Bozzuto's Order Form [Doc. # 52, Ex. X], and has filed

Corporation Business Tax returns in Connecticut.  FBF Conn. Tax Return [Doc. # 52, Ex. W].

## II. STANDARD

"Where a defendant challenges personal jurisdiction in a motion to dismiss, the plaintiff bears the burden of showing through actual proof that the court has jurisdiction over the defendant." Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566-67 (2d Cir. 1996); Jarrow Formulas, Inc. v. Int'l. Nutrition Co., 175 F. Supp. 2d 296, 300 (D. Conn. 2001) (citing Divicino v. Polaris Indus., 129 F. Supp. 2d 425, 428 (D. Conn. 2001)).  Where the parties have engaged in jurisdictional discovery, the plaintiff must assert facts that would be sufficient to assert personal jurisdiction over the defendant. Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990), cert. denied, 498 U.S. 854 (1990).  This proof may be established through "affidavits and supporting materials." Whelen Engineering Co., Inc. v. Tomar Electronics, Inc., 672 F. Supp. 659, 662 (D. Conn. 1987). "All pleadings and affidavits are construed in the light most favorable to the plaintiff."  Sherman Assocs. v. Kals, 899 F. Supp. 868, 870 (D. Conn. 1995); Beacon Enters.,Inc. v. Menzies, 715 F.2d 757, 768 (2d Cir. 1983); see also Jarrow, 175 F. Supp. 2d at 300-01.

"Connecticut utilizes a familiar two-step analysis to determine if a court has personal jurisdiction.  First, the

court must determine if the state's long-arm statute reaches the foreign corporation.  Second, if the statute does reach the corporation, then the court must decide whether that exercise of jurisdiction offends due process." Bensmiller v. E. I. Dupont de Nemours & Co., 47 F.3d 79, 81 (2d Cir. 1995); On-Line Technologies v. Perkin Elmer Corp., 141 F. Supp. 2d 246, 262 (D. Conn. 2000).

## III. DISCUSSION

FBF argues that this Court lacks jurisdiction under Connecticut's long arm statute because FBF's contractual performance was to take place in Florida, not Connecticut, and because it has not repeatedly solicited business in Connecticut or directly distributed its products here.  Additionally, FBF claims that it does not have sufficient minimum contacts with the state to satisfy due process.  Veritas, on the other hand, argues that both parties were to perform the contract in Connecticut, that FBF solicited funds both from it and from another Connecticut company, and that FBF targets Connecticut consumers in its advertising and distribution of Funny Bagels.

### A.    Long Arm Jurisdiction: Conn. Gen. Stat. § 33-929(f)

The Connecticut long arm statute provides, in relevant part, that "[e]very foreign corporation shall be subject to suit in this state... on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this

7

state[.]" Conn. Gen. Stat. § 33-929(f).[5]

Construing Connecticut law, courts in this District have held that the relevant contractual performance, for the purposes of applying the long arm statute, need not be that of the party over whom jurisdiction is sought.  See Chem Trading, Inc. v. Manufacture de Produits Chimiques de Tournan, 870 F. Supp. 21, 24 (D. Conn. 1994); Clemco Corp. v Frantz Mfg. Co., 609 F. Supp. 56, 57 (D. Conn. 1985); Bowman v. Grolsche Bierbrouwerij, BV, 474 F. Supp. 725, 731-32 (D. Conn. 1979).  Once Connecticut performance of a contract is established, § 33-929(f) is effectively incorporated into the constitutional due process analysis because "the legislature intended to exercise its full constitutional power over foreign corporations in cases falling within one of the designated causes of action."  Thomason v. Chemical Bank, 234 Conn. 281, 291, 661 A.2d 595 (1995); Lombard Bros., Inc. v. Gen. Asset Mgmt. Co., 190 Conn. 245, 255-56, 460 A. 2d 481 (1983).

In addition, "[e]ven incidental acts of performance of contracts in this state would come within our statute if the defendant [has] other significant contacts with this state." Lombard Bros., Inc., 190 Conn. at 256-57, 460 A. 2d 481; see also

---

[5] The prior enactment of the long arm statute, Conn. Gen. Stat. § 33-411 was replaced with Conn. Gen. Stat. § 33-929 on January 1, 1997.  Since the two statutes are identical, the Court may rely on case law interpreting the former statute, Conn. Gen. Stat. § 33-411(c).  See Adams v. Guthy Renker Corp., 106 F. Supp. 2d 400, 404 n.3 (D. Conn. 2000).

Bowman, 471 F. Supp. at 731-32.

The question for long arm jurisdiction is thus whether this action arises out of a contract that at least one of the parties was to perform here.[6]  The subscription agreements between the parties are contracts.  Each subscription called for the delivery of $500,000 to the defendant and for the defendant's delivery of the corresponding promissory note to the plaintiff.  See Subscription Agreement [Doc. # 52, Ex. B] ("Contemporaneously with the execution of this Agreement, Subscriber shall deliver the purchase price for the Units to the Company [Funny Bagel]. ...Promptly following receipt of a fully executed Agreement..., the Company will deliver to Subscriber the Note purchased by the Subscriber...").  The notes were incorporated into their respective subscription agreements as "Exhibit A."  While the plaintiff purports to sue on the notes themselves, the subscription agreements mandated the creation of the promissory notes.  Thus, for jurisdictional purposes, the case at hand has

_____

[6] Neither party has suggested that any contract was made in Connecticut.  "In Connecticut, a contract is considered made when and where the last thing is done which is necessary to create an effective agreement." Chem. Trading, Inc. v. Manufacture de Produits Chimiques de Tournan, 870 F. Supp. 21, 23 (D. Conn. 1994) (internal citations omitted).  In this case, it is not clear whether the last thing required to make the subscription agreements effective was Veritas' signature in Connecticut or FBF's acknowledgment in Florida.  However, since the Court finds that at least one party performed under the subscription agreements in Connecticut, see infra at 11, it unnecessary to address the issue of where the agreements were made.

arisen out of the subscription agreements.

FBF performed under the subscription agreements by delivering the promissory notes to Veritas' Chief Financial Officer, Norman Ziegler, in Connecticut.  Ziegler Aff. ¶ 6.  Veritas performed by wiring $1,000,000 to FBF, in Florida, from its Connecticut bank account.

The Connecticut Supreme Court's holdings in <u>Lombard Bros.</u>, 190 Conn. at 255-56, and <u>Thomason</u>, 234 Conn. at 291, make evident that contract performance may be found to satisfy statutory long arm requirements where an item either is sent or received, so long as the defendant's other contacts with the state satisfy due process requirements.  In <u>Teleco Oilfield Servs., Inc. v. Skandia Ins. Co., Ltd.</u>, 656 F. Supp. 753, 757 (D. Conn. 1987), a Connecticut company filed suit against a Scandinavian insurance company for non-payment of claims.  The Connecticut plaintiff sent premium payments from Connecticut to Scandinavia and received payment of claims in Connecticut.  <u>Id.</u>  Additionally, the plaintiff submitted quarterly reports to the defendant insurance company, which exercised its rights to inspect the plaintiff's books in Connecticut.  <u>Id.</u> at 755-56.  The court thus concluded that the insurance company was subject to jurisdiction in Connecticut because plaintiff performed here by sending premiums from Connecticut and defendant had other Connecticut contacts.

By contrast, in <u>Coan v. Bell Atlantic Sys. Leasing, Inc.</u>, 813 F. Supp. 929, 944 (D. Conn. 1990), the mere fact that "payments were generated from Connecticut" was held insufficient to establish jurisdiction where the defendant did not have other significant contacts with the state, even though the payments constituted full contract performance.  In <u>Coan</u>, which involved a complex sale and leaseback arrangement, the defendant's only other business connections with Connecticut were the use of the Connecticut address of one of its employees to receive mail and the one-time visit of one of its officers to plaintiff in Connecticut to discuss tax shelter transactions.  <u>Id.</u> at 942. <u>Coan</u> expressly noted the difference between the defendant's Connecticut contacts and those in <u>Teleco</u>: "the facts giving rise to [<u>Teleco</u>] involve far more involved relations that those in the present suit."  <u>Id.</u> at 944.  Even if payment from Connecticut did constitute performance under the long arm statute, the court reasoned, the "application of [§ 33-929(f)(1)] to the facts here would exceed constitutional limits."  <u>Id.</u>

In the instant case, because Veritas performed under the subscription agreements by delivering $1,000,000 from Connecticut to Florida and FBF performed by delivering the promissory notes from Florida to Connecticut, both parties can be said to have performed in Connecticut, satisfying the requirements of the long arm statute.

11

**B.    Constitutional Due Process**

Having determined that the plaintiff has satisfied the long-arm statute, the Court must ensure that such exercise of jurisdiction comports with due process standards.  The constitutional test is whether the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Int'l. Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  The Court examines whether the totality of "the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there."  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); Kulko v. California Super. Ct., 436 U.S. 84, 92, 97-98 (1979); Hanson v. Denckla, 357 U.S. 235, 251, 253 (1958); Lombard Bros., Inc., 190 Conn. at 255, 460 A. 2d 481.

> [A]lthough the commission of some single or occasional
> acts of the corporate agent in a state sufficient to
> impose an obligation or liability on the corporation
> has not been thought to confer upon the state authority
> to enforce it, Rosenberg Bros. & Co. v. Curtis Brown
> Co., 260 U.S. 516, other such acts, because of their
> nature and quality and the circumstances of their
> commission, may be deemed sufficient to render the
> corporation liable to suit.

Int'l. Shoe, 326 U.S. at 318.

The Constitution permits the exercise of either "specific" personal jurisdiction or "general" personal jurisdiction over out-of-state defendants.  Specific jurisdiction exists where the

12

defendant:

> "has 'purposefully directed' [its] activities at
> residents of the forum, <u>Keeton v. Hustler Magazine,
> Inc.</u>, 465 U.S. 770, 774 (1984), and the litigation
> results from alleged injuries that 'arise out of relate
> to' those activities, <u>Helicopteros Nacionales de
> Columbia, S.A. v. Hall</u>, 466 U.S. 408, 414 (1984)."

<u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472-73 (1985).

Alternatively, general jurisdiction can be established "even when

the cause of action did not arise out of or relate to the foreign

corporation's activities in the forum State" as long as the

defendant has had "continuous and systematic general business

contacts" with it.  <u>Helicopteros Nacionales de Columbia</u>, 466 U.S.

at 414, 416.

Here, FBF had a number of contacts with Connecticut, which

led to the creation of the subscription agreements in question

and serve as a basis for this Court's exercise of specific

jurisdiction.  These contacts, when taken as a whole, establish

that FBF could have contemplated that it might be called into

court in Connecticut on disputes arising out of the agreements.

First, FBF sought the assistance of MSC in securing capital

for its business, and while FBF asserts that it dealt with an MSC

representative in Florida, the agreement between the companies

clearly notes that any correspondence to MSC should be sent to

its Connecticut address.  Finder's Agreement [Doc. # 52, Ex. A].

That agreement describes MSC as an independent contractor acting

on behalf of FBF, <u>id.</u>, and the subscription agreements describe

MSC as FBF's exclusive placement agent.  Subscription Agreements
[Doc. # 52, Exs. B & C].  Based on the affidavit of Veritas'
counsel, it is clear that MSC approached Veritas, and arranged
the loan with it, in Connecticut,[7] and that FBF's attorney sent
documents pertaining to the loan to Veritas' counsel in
Connecticut.  Stone Aff. ¶ 4 [Doc. # 52]. Thus FBF, on its own
and through its agent MSC, had substantial contacts with
Connecticut during the course of negotiations over the
subscription agreements.

The plaintiff has also established grounds for general
jurisdiction over FBF.  FBF's employees traveled to Connecticut
to arrange similar loans from Amaranth, another Connecticut
company, augmenting the evidence of FBF's purposeful investment
seeking activities in Connecticut.  In addition, FBF endeavored
to sell its products in Connecticut.  While FBF attempts to
diminish the extent of these undertakings by representing that it
does not control where Funny Bagels are sold to consumers because
its products are distributed by third party food wholesalers and
supermarket chains, see Salgado Aff. ¶ 6 [Doc. # 34, Ex. A], FBF
"cannot escape jurisdiction merely by asserting that its []
products were distributed exclusively through a third party
retailer."  Whelen Eng'g Co., Inc., 672 F. Supp. at 664.  FBF's

---

[7] FBF has actually alleged that Veritas is a wholly owned
subsidiary of MSC.  Def. Mem. of Law in Support of Mot. to
Dismiss [Doc. # 34] at 7.

marketing activities in Connecticut are analogous to those of the defendant in <u>Whelen</u>, in which jurisdiction over the defendant was found to comport with due process even though the defendant's products were distributed exclusively through a third party and Connecticut consumers constituted less than 0.1% of its gross sales.  <u>Id.</u> at 661.  The defendant was found to have sufficient minimum contacts with Connecticut such that jurisdiction over it would be consistent with traditional notions of fair play and justice because the defendant's "pattern of product promotion and sales comprehended markets in Connecticut" and because "the company clearly anticipated a viable and growing sales market in Connecticut."  <u>Id.</u> at 664.

In the instant case, FBF's arrangements for product demonstrations and other promotions such as the Big Y Food Festival in Hartford clearly show anticipation of a Connecticut market for Funny Bagels, even if Connecticut accounted for only 1% of its aggregate sales, particularly in light of FBF's own Chief Operating Officer's identification of Hartford as a "focus market."  Smith email [Doc. # 52, Ex. L].

Given the numerous and consistent contacts that FBF and its agents and representatives have had with Connecticut in connection with both the arrangement of outside investment from Connecticut companies and the marketing of Funny Bagels products in Connecticut, it is clear that jurisdiction satisfies the

15

minimum contacts requirement.

**IV. CONCLUSION**

     Accordingly, defendant's motion to dismiss, [Doc. # 34], is

DENIED.

                      IT IS SO ORDERED.

                         /s/

                      _____

                      Janet Bond Arterton
                      United States District Judge

**Dated at New Haven, Connecticut this 10th day of August, 2005.**